IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**SPENCER SPIKER**,
                    Plaintiff,

            v.

**ALLEGHENY COUNTY BOARD OF
PROBATION AND PAROLE**, *et al.*
                    Defendant.

CIVIL ACTION NO.   10-864

**MEMORANDUM OPINION AND ORDER**

**CONTI, District Judge**

### I.    *Introduction*

Plaintiff Spencer Spiker ("Spiker" or "plaintiff") filed a second amended complaint in

this case on May 17, 2011 alleging violations of his civil rights under 42 U.S.C. § 1983 ("§

1983") based upon violations of the Fourth and Fourteenth Amendments of the United States

Constitution and various tort claims under Pennsylvania law. (ECF No. 108.) Pending before the

court are two motions to dismiss the second amended complaint and a motion for leave to file a

third amended complaint. The second amended complaint named the following seven individuals

as defendants in their individual and official capacities: (1) Jennifer DiGiovanni – Allegheny

County Assistant District Attorney ("DiGiovanni"); (2) Laura Ditka – Allegheny County Deputy

District Attorney ("Ditka" and together with DiGiovanni, the "DA defendants"); (3) Jacquelyn

Whittaker, a supervising probation officer with the Allegheny County Adult Probation Office

("Whittaker"); (4) Sean Kelly – detective with the Allegheny County Police Department

("Kelly" and together with Whittaker, the "county defendants"); (5) Jack Kearney – Lieutenant

with the Allegheny County Sheriff's Office ("Kearney"); (6) William Mullen – Allegheny

County Sheriff ("Mullen"); and (7) James Rieland – director of Allegheny County Adult Probation ("Rieland"). (Id. ¶¶ 3-10.)

Four motions to dismiss the second amended complaint were filed on May 31, 2011, with each defendant taking part in one of those motions. (ECF Nos. 109, 111, 115, 117.) In July 2011, plaintiff filed responses in opposition to each of the motions to dismiss. (ECF Nos. 120, 121, 123, 126.) On August 3, 2011, plaintiff filed a motion for reconsideration asking the court to reconsider its previous decision to dismiss plaintiff's equal protection claims against the DA defendants and for the court to allow plaintiff to file a third amended complaint. (ECF No. 127.) The DA defendants filed a response and brief in opposition to plaintiff's motion for reconsideration on August 23, 2011. (ECF Nos. 132, 133.) Plaintiff filed a reply to the DA defendants' response in opposition on September 30, 2011.  (ECF No. 134.) The DA defendants filed a motion to strike plaintiff's reply on the same day. (ECF No. 135.) The parties argued the motions to dismiss the second amended complaint and the motion for reconsideration during a hearing before the court held on October 24, 2011. The court took the matter under advisement and deferred ruling on the motions until a later date.

On March 19, 2012, plaintiff filed a motion for leave to file third amended complaint, but did not attach a proposed third amended complaint to the motion. (ECF No. 147.)  On April 10, 2012, the court ordered plaintiff to supplement the motion for leave to amend by attaching the proposed third amended complaint. On April 18, 2012, plaintiff supplemented the motion for leave to amend and attached a proposed third amended complaint to the motion. (ECF No. 156.) Plaintiff and Rieland reached a settlement in April 2012, and Rieland and Mullen are not named as defendants in the proposed third amended complaint. (Id. at 3 n.3.) On April 23, 2012, the court heard the parties' arguments with respect to plaintiff's motion for leave to file a third

amended complaint. The court took the matter under advisement and deferred ruling on that motion until a later date. Rieland's motion to dismiss the second amended complaint (ECF No. 115), Mullen's and Kearney's motion to dismiss the second amended complaint (ECF No. 117), and plaintiff's motion for reconsideration (ECF No. 127) were denied as moot in light of plaintiff's pending motion for leave to file a third amended complaint in which Rieland, Mullen, and Kearney are not named defendants. On January 14, 2011, plaintiff informed the court that he filed a petition for bankruptcy relief and sought a stay in this court in order for the bankruptcy court to approve the retention of plaintiff's counsel in this case. (ECF No. 98.) On November 28, 2012, plaintiff advised this court that the bankruptcy court approved the retention of plaintiff's counsel in this case. (ECF No. 184.) The DA defendants' and the county defendants' motions to dismiss the second amended complaint and plaintiff's motion for leave to file a third amended complaint are now ripe to be decided by the court.

## II.     Factual Allegations in the Second Amended Complaint

On May 27, 2009, plaintiff pleaded guilty in state court to indecent assault against a person less than thirteen years of age, in violation of 18 PA. CONS. STAT. § 3126(a)(7), and to endangering the welfare of children, in violation of 18 PA. CONS. STAT. § 4304(a)(1). (ECF No. 108 ¶ 11.) Plaintiff was sentenced to five years probation as well as a one-year term of intermediate punishment, and was required to register as a sexual offender pursuant to 42 PA. CONS. STAT. § 9795.1. (Id.) After sentencing on May 27, 2009, plaintiff reported to the Allegheny County Board of Probation and Parole Intake Office (the "Probation Intake Office"). Sherri Dicicco ("Dicicco"), a Probation Intake Office employee, processed plaintiff's paperwork. (Id. ¶¶ 11-13.) Dicicco never informed plaintiff about the registration requirements and did not collect and forward his information to the Pennsylvania State Police (the "state police"), (Id. ¶

13), which plaintiff asserts was required by 42 PA. CONS. STAT. § 9795.2(a)(4)(1). Section 9795.2(a)(4)(1) provides:

> Where the offender or sexually violent predator was granted parole by the Pennsylvania Board of Probation and Parole or the court or is sentenced to probation or intermediate punishment, the board or county office of probation and parole shall collect registration information from the offender or sexually violent predator and forward that registration information to the Pennsylvania State Police.

42 PA. CONS. STAT. § 9795.2(a)(4)(1). Dicicco did not know that probation personnel were required by law to inform sexual offenders of their reporting requirements and to collect registration information from the offenders to forward to the state police for entry into the sexual offender registry. (ECF No. 108 ¶ 13.) Dicicco informed plaintiff that there were no standard policies or procedures for processing in the Probation Intake Office. (ECF Nos. 108 ¶ 13, 108-1.) Plaintiff avers that Rieland, director of Allegheny County Adult Probation, did not train his employees and enforce rules and policies which would have ensured Dicicco's compliance with section 9795.2(a)(4)(1). (ECF No. 108 ¶¶ 14-15.) Plaintiff contends this failure constituted deliberate indifference to the rights of sexual offenders because the failure to register constitutes a separate and serious crime. (Id. at ¶ 15.)

On June 18, 2009, DiGiovanni instructed Kelly to verify plaintiff's compliance with the sexual offender registration requirements. (ECF No. 108 ¶ 16.)   According to plaintiff, DiGiovanni acted beyond the scope of her role as a prosecutor in instructing Kelly to investigate plaintiff's compliance with the registration requirements of sexual offenders because, given the totality of the circumstances, DiGiovanni did not have probable cause or reasonable suspicion to believe plaintiff intentionally, knowingly, or recklessly failed to comply such requirements. (Id. ¶ 18.) Plaintiff alleges DiGiovanni was "fed false information about Spiker by a mutual acquaintance…which prompted her to irrationally and arbitrarily view Spiker differently from

other defendants she had prosecuted." (Id. ¶ 93.) According to plaintiff, it was this "personal animus which prompted [DiGiovanni] to start what was in essence a unique investigation against Spiker, to over-see aspects of the investigation, such as insuring his name was published as a highly wanted fugitive and insuring that a detainer was imposed against him." (Id.) Plaintiff avers that as a lawyer, DiGiovanni should have known that Pennsylvania law requires the county probation office – not the sexual offender – to submit initial registration information to the state police. (Id. ¶ 17.) Plaintiff avers DiGiovanni was aware that Dr. Paul Bernstein performed an evaluation of plaintiff and that plaintiff did not present the personality type of a sex offender. Plaintiff alleges DiGiovanni knew the following:

> a. Plaintiff was a thirteen-year veteran Army Officer who would have inherently followed all instruction provided without fail;
>
> b. That Plaintiff was attending daily AA meetings;
>
> c. That Plaintiff was attending intensive therapy sessions at the Western Psychiatric Institute and Clinic for depression and alcoholism with positive reports; and
>
> d. That the sex offender registration laws are not intended to be punitive in nature – the legislative intent was purely to safeguard the interest of public safety and not to further punish the registrants.

(ECF No. 108 ¶ 18.)

Kelly called the state police pursuant to DiGiovanni's instruction and determined plaintiff was not registered as a sex offender. (ECF No. 108 ¶ 19.) According to plaintiff, this information did not provide DiGiovanni or Kelly probable cause that plaintiff committed a crime because it was not evidence plaintiff intentionally, knowingly, or recklessly committed the crime, and DiGiovanni knew the Probation Intake Office had the initial burden of forwarding the plaintiff's information to the state police in order to register plaintiff as a sexual offender. (Id.) Plaintiff

contends DiGiovanni should have been aware that a mistake in the registration process occurred and that plaintiff had not committed a crime. (Id.) According to plaintiff, monitoring individuals subject to sex offender registration is the responsibility of the state police and is outside the jurisdictional duties and responsibilities of the district attorney's office. (Id. ¶ 21.)

On June 25, 2009, Kelly applied for and received a warrant for plaintiff's arrest for failure to register as a sexual offender. (ECF No. 108 ¶ 20.) On July 1, 2009, twenty-three days after the entry of plaintiff's guilty plea and his sentencing, plaintiff was arrested (sometimes referred to as the "first arrest") for failure to register as a sexual offender by the West Homestead Police acting on an arrest warrant from the Allegheny County Police Department. (Id. ¶¶ 21, 23.) Plaintiff was released on his own recognizance on a non-monetary bond with instructions to ensure compliance with sexual offender registration requirements by July 8, 2008. (Id. ¶¶ 23, 27.) Plaintiff provided the state police with all the necessary registration information on the evening of July 1, 2009. (Id. at 27.) Plaintiff avers Ditka knew of and encouraged DiGiovanni to take the steps causing plaintiff's arrest on July 1, 2009, and therefore, was not acting in her capacity as a prosecutor. (ECF No. 108 ¶ 58.) Plaintiff avers Ditka knew it was responsibility of the Allegheny County Probation Office to make the initial registration of plaintiff and also knew the Allegheny County Adult Probation Office failed to train its employees and adopt polices ensuring such registration. According to plaintiff, Ditka knew or should have known that plaintiff was not in violation of the terms of his probation and had not violated section 9795.2(a)(4)(1).

On July 2, 2009, plaintiff was arrested (sometimes referred to as the "second arrest") for violating his probation because of his arrest on July 1, 2009 for failing to register as a sexual offender. (ECF No. 108 ¶ 28.) Plaintiff contends he did not know an arrest was a violation of his

probation because at time of his second arrest he had not been assigned a probation officer or advised about the rules of probation. (Id. ¶ 29.) Plaintiff asserts the second arrest was initiated by Whittaker, a supervisor of the Allegheny County Adult Probation Office, who sought a bench warrant for plaintiff's arrest at the direction of DiGiovanni and according to Allegheny County Adult Probation Office policies. (Id. ¶¶ 5, 30.) Several days after plaintiff's second arrest, Whittaker issued a detainer which caused plaintiff to remain in custody for 320 days until his trial and subsequent acquittal. (Id. ¶ 32.) According to plaintiff, "a detainer is typically issued when a defendant is a chronic or repeat violator of probation terms, a threat to public safety or a likely flight risk from justice." (Id. ¶ 33.) Plaintiff avers he never violated his probation and was not a flight risk or threat to public safety, and that Whitaker knew he reported to the probation office after his sentencing. (Id.) Following the issuance of the detainer, plaintiff and his family members sent multiple letters to DiGiovanni, Ditka, and Whittaker requesting the prosecution be stopped and the detainer lifted. (Id. ¶ 36.) DiGiovanni, Ditka, and Whittaker did not respond or adhere to these requests. (Id.) On May 13, 2010, plaintiff was acquitted on the charge of failing to comply with the registration requirements of 42 PA. CONS. STAT. § 9795.1.  (Id. ¶ 52.)

Plaintiff avers his name was placed on the Allegheny County Sheriff's Most Wanted Fugitive List at the direction of DiGiovanni. Plaintiff claims publically available records indicate plaintiff is the only individual that has been listed on the Allegheny County Sheriff's most Wanted Fugitive List under similar circumstances  because "[a]ll other individuals had otherwise previously absconded or had overtly eluded capture." (ECF No. 108 ¶ 50.)

Plaintiff alleges that he suffered the loss of a high-level appointment at a prominent university and future employment opportunities commensurate with his experience as a result of his arrests and subsequent detention.  Plaintiff is no longer able to support his family, and has

lost his family home, vehicle, free college tuition benefits, and health insurance.  Plaintiff alleges

that he has suffered physically and emotionally from the stress induced by his incarceration.

(ECF No. 108 ¶ 53.)

###    III.    Factual Allegations in the Proposed Third Amended Complaint

In the proposed third amended complaint, plaintiff repeats the allegations of the second

amended complaint and in addition avers the Allegheny County Adult Probation Office had a

policy entitled "Megan's Law Registration," which mandates all probation employees be

informed and equipped to undertake the registration of sexual offenders. (ECF No. 156-1 ¶ 11.)

Plaintiff attached two different policies to the proposed third amended complaint. (Id. at 24, Ex.

1.) The first policy has an effective date of April 17, 2006. (Id.) The policy provides: "most

offenders are registered at Intake or by Probation Officers supervising sex offenders," and "when

Intake moves to the Courthouse, Intake personnel will process offenders received from court."

(Id.) The policy refers to a "Megan's Law packet," which describes the "procedures to be used

with each registration," and includes instructions to take a "digital picture . . . of the offender."

(Id.) According to plaintiff, this policy shows that Allegheny County Adult Probation was aware

of its statutory charge and was equipped to register sex offenders for Megan's Law purposes.

(ECF No. 156 ¶ 10.)

The second policy attached to the proposed third amended complaint has an effective

date of October 9, 2008. (ECF No. 156-1 at 25, Ex. 1.) This policy provides, among other things:

> On all Megan's Law cases, it is the probation officer's responsibility to check the
> Megan's Law website at http://www.pameganslaw.state.pa.us/ to verify the
> current registration status and addresses for residence, employment, and school. If
> the offender who is subject to the Megan's Law requirements is not registered,
> then the currently assigned probation officer is to register the offender by
> following the above stated procedures. Furthermore, it is imperative that
> probation officers ensure that all Megan's Law offenders have the correct current

> address listed in APCMS and are identified in the database as Megan's Law cases [sic]

(Id.) According to plaintiff, "this language suggests that the adult probation office had a practice of registering offenders who somehow slipped through the cracks and had failed to register at intake." (ECF No. 156-1 ¶ 13.)

Plaintiff avers Kelly, as a Megan's Law Compliance Officer, knew or should have known about the policy of the Allegheny County Probation Office to register sex offenders and that Pennsylvania law requires the county probation office, not the sexual offender, to collect and submit initial registration information to the state police. (ECF No. 156-1 ¶ 17.) Plaintiff contends Kelly deliberately and recklessly omitted information about the policy in his affidavit of probable cause used to secure the arrest warrant. (Id. ¶ 18.)

According to plaintiff, Whittaker knew about the Megan's Law registration policy but "deliberately and recklessly omitted important and vital information" when she sought the bench warrant for plaintiff's arrest. (ECF No. 156-1 ¶ 28.) Plaintiff avers Whittaker failed to disclose that plaintiff had reported to probation intake and that Dicicco failed to follow the Allegheny County Adult Probation Office policy. (Id.) Plaintiff avers that when Whittaker sought the detainer, she failed to inform the judge that when sexual offenders are not registered, it is the policy of the Allegheny County Probation Office to register, not incarcerate, the offenders. (Id.) Plaintiff contends the "sheer speed at which the Plaintiff was re-arrested after being released is atypical of how the normal process for revoking an individual's probation works, and shows that unwarranted and unfounded special interest and treatment was given to the Plaintiff." (Id. ¶ 29.)

## IV.   *Standard of Review*

A motion to dismiss tests the legal sufficiency of the complaint. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on

whether the plaintiff will be likely to prevail on the merits; rather, when considering a motion to dismiss, the court accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. U.S. Express Lines Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002). While a complaint does not need detailed factual allegations to survive a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, a complaint must provide more than labels and conclusions. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). A "formulaic recitation of the elements of a cause of action will not do." Id. (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to raise a right to relief above the speculative level" and "sufficient to state a claim for relief that is plausible on its face." Id. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 667 (citing Twombly, 550 U.S. at 556).

The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. . . . Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" Iqbal, 556 U.S. at 667 (quoting Twombly, 550 U.S. at 556) (internal citations omitted). Two working principles underlie Twombly. Iqbal, 556 U.S. at 667. First, with respect to mere conclusory statements, a court need not accept as true all the allegations contained in a complaint. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Second, to survive a motion to dismiss, a claim must state a plausible claim for relief. Id. at 679. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and

common sense." Id.  "But where the well-pleaded facts do not permit the court to infer more

than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n] —

that the pleader is entitled to relief.'" Id. (quoting FED. R. CIV. P. 8(a)(2)). A court considering a

motion to dismiss may begin by identifying pleadings that are not entitled to the assumption of

truth because they are mere conclusions.

> While legal conclusions can provide the framework of the
> complaint, they must be supported by factual allegations. When
> there are well-pleaded factual allegations, a court should assume
> their veracity and then determine whether they plausibly give rise
> to an entitlement to relief.

Id.

The court may grant a plaintiff leave to amend a complaint under Federal Rule of Civil

Procedure 15, which provides: "The court should freely give leave [to amend] when justice so

requires." FED. R. CIV. P. 15. Rule 15, however, "does not permit amendment when it would be

futile. Futility "'means that the complaint, as amended, would fail to state a claim upon which

relief could be granted.'" Kenny v. United States, No. 10-4432, 2012 WL 2945683, at *4 (3d

Cir. July 19, 2012) (citing Burtch v. Millberg Factors, Inc., 662 F.3d 212, 231 (3d Cir. 2011)).

"The standard for deciding whether claims are futile for the purpose of granting leave to amend a

complaint is the same as a motion to dismiss." Markert v. PNC Financial Servs. Group, Inc., 828

F. Supp. 2d 765, 771 (E.D. Pa. 2011). "[I]f the court determines that plaintiff has had multiple

opportunities to state a claim but has failed to do so, leave to amend may be denied." See 6

CHARLES A. WRIGHT, ARTHUS R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND

PROCEDURE § 1487 (2d ed. 2010).

Based upon the foregoing, the court will first address defendants' motions to dismiss the

second amended complaint. If the court finds reason to dismiss any of plaintiff's claims in the

second amended complaint, the court will determine whether the factual allegations set forth in the proposed third amended complaint cure the defects warranting dismissal of a claim in the second amended complaint. If the proposed third amended complaint does not cure the defects of a claim set forth in the second amended complaint, the amendment will be futile, and the claim will be dismissed without leave to amend. If the third amended complaint cures the defects and sets forth a plausible claim for relief, the court will grant plaintiff leave to amend to file a third amended complaint to include that claim.

## V.    *Discussion*

"Title 42 U.S.C. § 1983 is not a source of substantive rights but a vehicle for vindicating rights conferred by the U.S. Constitution or by federal statute." DiBella v. Beachwood, 407 F.3d 599, 601 (3d Cir. 2005). "To make a prima facie case under § 1983, the plaintiff must demonstrate that a person acting under color of law deprived him of a federal right." See Groman v. Manalapan, 47 F.3d 628, 633 (3d Cir. 1995). Section 1983 provides in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United State or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress.

42 U.S.C. § 1983. This remedial statute does not create substantive rights. Maher v. Gagne, 448 U.S. 122, 129 n.11 (1980). "A plaintiff cannot prevail in an action brought under § 1983 without establishing an underlying violation of a federal constitutional or statutory right." Ickes v. Borough of Bedford, 807 F.Supp.2d 306, 315 (W.D. Pa. 2011). In the second and proposed third amended complaints, Spiker alleges defendants violated his constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution. Each claim will be addressed.

### A.    FOURTH AMENDMENT CLAIMS (COUNTS I-III)

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST., AMEND. IV. Spiker alleges defendants violated his rights under the Fourth and Fourteenth Amendments by reason of his false arrest and false imprisonment and their malicious prosecution against him. Specifically, in count I of the second and proposed third amended complaints, Spiker asserts claims for false arrest and false imprisonment against DiGiovanni, Ditka, and Kelly for causing his first arrest on July 1, 2009 and subsequent imprisonment without probable cause. (ECF Nos. 108 ¶¶ 55-64; 156-1 ¶¶ 43-52.) In count II of the second and proposed third amended complaints, Spiker asserts claims for false arrest and false imprisonment against DiGiovanni, Kelly, and Whittaker for causing his second arrest on July 2, 2009 and the detainer to issue without probable cause. (ECF Nos. 108 ¶¶ 65-81; 156-1 ¶¶ 53-63.) In count III of the second and proposed third amended complaints, Spiker asserts claims for false arrest, false imprisonment, and malicious prosecution against Kelly for "initiat[ing] criminal proceedings against Spiker for failure to register as a sexual offender" and against Whittaker for causing a detainer to issue against Spiker for violating the terms of his probation, which caused him to remain in jail for 320 days pending trial. (ECF Nos. 108 ¶¶ 82-89; 156-1 ¶¶ 64-71.)

The court will address Spiker's false imprisonment, false arrest, and malicious prosecution claims under the Fourth Amendment[1] and not the Due Process Clause of the Fourteenth Amendment. The Supreme Court has held: "Where a particular Amendment

---

[1] The Fourteenth Amendment makes the Fourth Amendment applicable to the states. <u>Mapp v. Ohio</u>, 367 U.S. 643, 655 (1961).

'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." <u>Albright v. Oliver</u>, 510 U.S. 266, 273 (1994) (quoting <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1989)). "The Supreme Court has rejected claims that wrongful arrest and use of excessive force constitute substantive due process violations, finding instead that the Fourth Amendment is the constitutional provision relevant to such allegations." <u>Cook v. Upper Darby</u>, No. 06-2410, 2006 WL 2128160, at *1 (citing <u>Albright</u>, 510 U.S. 266).

To set forth plausible claims for false arrest or false imprisonment[2] and malicious prosecution[3] under the Fourth Amendment, Spiker must aver factual allegations sufficient to support a reasonable inference that, among other things, the relevant defendants acted without probable cause. If Spiker failed to set forth factual allegations sufficient to support a reasonable

---

[2] "'The Supreme Court has clarified that false arrest and false imprisonment overlap.'" <u>Brown v. Cohen</u>, No. 09-2909, 2011 WL 2110827, at *5 (E.D. Pa. Apr. 21, 2011) (citing <u>Wallace v. Kato</u>, 549 U.S. 384 (2007)). "The proper inquiry in a section 1983 claim based on false arrest . . . [is] whether the arresting officers had probable cause to believe the person arrested had committed the offense." <u>Dowling v. Phlia.</u>, 855 F.2d 136, 141 (3d Cir. 1988). "'[W]here the officer lacks probable cause to make an arrest, there can be a Fourth Amendment claim for false imprisonment based on the detention pursuant to the arrest.'" <u>Brown</u>, 2011 WL 2110827, at *5 (quoting <u>Groman v. Manalapan</u>, 47 F.3d 628, 636 (3d Cir. 1995)).

[3] To sustain a § 1983 claim for malicious prosecution, the plaintiff must show:

> (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) **the proceeding was initiated without probable cause**; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

<u>DiBella</u>, 407 F.3d at 601 (citing <u>Estate of Smith v. Marasco</u>, 318 F.3d 497, 521 (3d Cir. 2003)) (emphasis added).

inference that a defendant acted without probable cause, all Fourth Amendment claims with respect to those actions against that defendant must fail.

"Probable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested." United States v. Myers, 308 F.3d 251, 255 (3d Cir. 2002). "'A police officer may be liable for civil damages for an arrest if "no reasonable competent officer" would conclude that probable cause exists.'" Wilson v. Russo, 212 F.3d 781, 786 (3d Cir. 2000) (citing Malley v. Briggs, 475 U.S. at 341 (1986)).

Spiker alleges that at DiGiovanni's instruction, Kelly obtained an arrest warrant for the first arrest based upon Spiker's failure to register as a sexual offender, a violation of 18 PA. CONS. STAT. § 4915. Section 4915 provides in pertinent part:

> **(a) Offense defined.--**An individual who is subject to registration under 42 Pa.C.S. § 9795.1(a) or (a.1) (relating to registration) or an individual who is subject to registration under 42 Pa.C.S. § 9795.1(b) or who was subject to registration under former 42 Pa.C.S § 9793 (relating to registration of certain offenders for ten years) commits an offense if he knowingly fails to:
>
>> (1) register with the Pennsylvania State Police as required under 42 Pa.C.S. § 9795.2 (relating to registration procedures and applicability);

18 PA. CONS. STAT. § 4915. Section 4915 holds the sexual offender responsible for knowingly failing to register with the Pennsylvania State Police. As set forth in the second amended and proposed third amended complaints, Spiker was required to register as a sexual offender, but was not registered with the Pennsylvania State Police when Kelly obtained the warrant for his first

arrest.[4] Defendants argue these facts were sufficient to show probable cause existed for the first arrest of Spiker for knowingly failing to register as a sexual offender.

The issue before the court, however, is not so simple. The determination whether defendants had probable cause for Spiker's first arrest for failing to register is based upon the interpretation of the registration requirements found in 42 PA. CONS. STAT. § 9795.2. Section 9795.2(a)(1) provides:

> Offenders and sexually violent predators shall be required to register with the Pennsylvania State Police upon release from incarceration, upon parole from a State or county correctional institution or upon the commencement of a sentence of intermediate punishment or probation. For purposes of registration, offenders and sexually violent predators shall provide the Pennsylvania State Police with all current or intended residences, all information concerning current or intended employment and all information concerning current or intended enrollment as a student.

42 PA. CONS. STAT. § 9795.2(a)(1). This provision mandates that sexual offenders register with the state police and that the sexual offenders provide the state police with the necessary information to register the sexual offender. Under section 9795.2(a)(4)(i), however, a duty is also imposed on probation offices to forward certain sexual offenders' information to the state police. That provision provides:

> Where the offender or sexually violent predator was granted parole by the Pennsylvania Board of Probation and Parole or the court or is sentenced to

---

[4] Kelly's affidavit of probable cause used to obtain the arrest warrant provided:

> On 6-18-09 your affiants were requested by Assistant District Attorney, Jennifer DiGiovanni to investigate a Megan's Law violation. DiGiovanni reported that Spencer H. Spiker (WM, 37 YOA) had not registered as required for ten year reporting requirement of Megan's Law.

> On 6-25 a chech [sic] was made with the PA. State Police Megan's law Registration unit who reported that Spiker had not registered as of this date.

(ECF No. 110-1.)

probation or intermediate punishment, the board or county office of probation and parole shall collect registration information from the offender or sexually violent predator and forward that registration information to the Pennsylvania State Police.

42 PA. CONS. STAT. § 9795.2(a)(4)(i). The determination of probable cause in this case rests upon the proper interpretation of section 9795.2 and whether in light of the probation office's duty set forth in section 9795.2(a)(4)(i) and the facts alleged in the second amended or proposed third amended complaint, defendants are able to establish as a matter of law probable cause for Spiker's first arrest, i.e., for failing to register as a sexual offender.

Spiker alleges that section 9795.2(a)(4)(i) places "the **initial** registration responsibility with the Allegheny County Adult Probation and **not the offender**." (ECF No. 156-1 ¶ 9.) Under Spiker's interpretation of section 9795.2(a)(4)(i), because he was on probation and reported to the probation office, probable cause is lacking for an arrest or imprisonment for a violation of section 4915. He argues the probation office, not the sexual offender, has the initial burden to ensure the sexual offender is registered.

In support of his argument, Spiker alleges in the proposed third amended complaint that when the probation office learns a sexual offender is not registered, it is the policy of the probation office to register him. (ECF No. 156-1 ¶ 11.) DiGiovanni and Ditka argue, however, that Spiker, as the sexual offender, had a duty to register with the state police that was independent of the probation office's duty to forward Spiker's registration information to the state police, and, therefore, DiGiovanni, Ditka, and Kelly had probable cause to believe that Spiker violated section 4915. They knew he was required to register and the state police informed Kelly that he was not registered as a sexual offender. The plain reading of section

9795.2, the other provisions of Megan's Law, and the legislative history of section 9795.2,[5] which does not provide guidance on the issue, support the plausibility of both Spiker's and those defendants' interpretations of section 9795.2. There are no Pennsylvania state court decisions that inform the court about the proper interpretation of section 9795.2. The court need not determine which interpretation of section 9795.2 is correct, however, because regardless whether DiGiovanni, Ditka, and Kelly acted without probable cause, they are entitled to either absolute or qualified immunity for their actions in causing Spiker's first arrest on July 1, 2009 and the second arrest and detention on July 2, 2009. Under those circumstances, the claims asserted in counts I through III of the second amended complaint against those defendants must be dismissed and the allegations in the proposed third amended complaint are insufficient to overcome the immunity afforded those defendants for the actions relevant to those claims.

> i.   **Immunity with respect to the July 1, 2009 arrest, July 2, 2009 arrest, and subsequent imprisonment (counts I-III)**

Although the language of § 1983 speaks of no immunities, the Supreme Court has always applied common-law immunities to constitutional claims brought under that section. It reasoned that Congress would have expressly made common-law immunities inapplicable to § 1983 actions within the statutory text if it had intended to do so. Pierson v. Ray, 386 U.S. 547, 554-55 (1967). For this reason, state officials, like DiGiovanni, Ditka, and Kelly, may be absolutely or qualifiedly immune from suit for their alleged participation in causing Spiker's arrests and subsequent imprisonment in this case. These immunities are not merely a defense to liability, but "an entitlement not to stand trial or face the other burdens of litigation." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). The Supreme Court has often stressed the importance of resolving

---

[5] See Pennsylvania Legislative Journal, Senate, 2000, p. 1273 (Feb. 2, 2000); Pennsylvania Legislative Journal, Senate, 2000, p. 1535 (May 3, 2000).

immunity issues at the earliest possible stage in litigation. <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991) (per curiam).

### ii.    Absolute Immunity

The DA defendants argue they are entitled to absolute immunity. "Absolute prosecutorial immunity affixes to actions 'intimately associated' with the judicial aspects of litigation, but not to administrative and investigatory conduct not related to conducting or initiating judicial proceedings." <u>Church of Universal Love and Music v. Fayette Cnty.</u>, No. 10-1422, 2012 WL 3779171, at *9 (W.D. Pa. Aug. 31, 2012) (quoting <u>Odd v. Malone</u>, 538 F.3d 202, 208 (3d Cir. 2008)). To analyze whether a government official is entitled to absolute immunity requires a court to make two basic determinations: (1) "just what conduct forms the basis for the plaintiff's cause of action," and (2) "what function (prosecutorial, administrative, investigative, or something else entirely) that act served." <u>Schneyder v. Smith</u>, 653 F.3d 313, 331 (3d Cir. 2011). The determination of what conduct forms the basis for a plaintiff's claims "'focuses on the unique facts of each case and requires careful dissection of the prosecutor's actions.'" <u>Id.</u> "The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties," and "the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." <u>Burns v. Reed</u>, 500 U.S. 478, 486-87 (1991). The Supreme Court of the United States has held "that in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." <u>Imbler v. Pachtman</u>, 424 U.S. 409, 431 (1976). To the extent that any of Spiker's Fourth Amendment claims against DiGiovanni or Ditka rest on their actions in initiating the charges against him or continuing to prosecute him, those defendants are entitled to absolute immunity for those actions. With respect to whether DiGiovanni, Ditka, Kelly, and Whittaker are

entitled to absolute or qualified immunity for the other actions taken by those defendants that form the basis of Spiker's claims, a more detailed analysis is required.

### iii.    Qualified Immunity

Defendants argue they are entitled to qualified immunity in this case. In <u>Saucier v. Katz</u>, 533 U.S. 194, 200-01 (2001), the Supreme Court set forth a mandatory two-part analysis for courts to use to determine whether a state actor is entitled to qualified immunity. The first step was to determine whether "the facts alleged show the [state actor's] conduct violated a constitutional right." <u>Id.</u> at 201. The Court found this was a mandatory part of a qualified immunity analysis and held "[t]his must be the initial inquiry." <u>Id.</u> The Court found the second part of the analysis was to determine "whether the [constitutional] right was clearly established." <u>Id.</u>

In <u>Pearson v. Callahan</u>, 555 U.S. 223 (2009), the Court held "while the sequence set forth [in <u>Saucier</u>] is often appropriate, it should no longer be regarded as mandatory." <u>Pearson</u>, 555 U.S. at 236. The Court reasoned:

> [T]he rigid <u>Saucier</u> procedure comes with a price. The procedure sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case. There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right. District courts and courts of appeals with heavy caseloads are often understandably unenthusiastic about what may seem to be an essentially academic exercise.

<u>Pearson</u>, 555 U.S. at 236-37. In support of its decision, the Court cited decisions in which the presiding court found good reason to not analyze whether there had been a constitutional violation in determining whether the defendant was entitled to qualified immunity.[6] The Court

---

[6] In <u>Pearson</u>, the Court found support for its decision in lower court decisions in which the courts found good cause not to analyze whether there had been a constitutional violation in determining

cited, among other decisions, <u>Egolf v. Witmer</u>, 526 F.3d 104, 109-11 (3d Cir. 2008), in which the Third Circuit Court of Appeals found an exception to the otherwise mandatory <u>Sauicer</u> analysis for cases in which "a constitutional decision rest[s] on an uncertain interpretation of state law." <u>Pearson</u>, 555 U.S. at 238. The court in <u>Egolf</u> acknowledged <u>Saucier's</u> "underlying principle of first requiring constitutional analysis is to advance the elaboration of the law to give state actors better guidance on the parameters of constitutional violations." <u>Egolf</u>, 526 F.3d at 109. The court found needlessly engaging in a predictive constitutional analysis in cases of first impression of state law would "do a disservice to state actors who would be induced to rely on a ruling that might change altogether upon subsequent review by the state court." <u>Id.</u> at 110.

In <u>Egolf</u>, the court acknowledged it had "a longstanding practice of avoiding constitutional questions in cases where [it could] reach a decision upon other grounds." <u>Egolf</u>, 536 F.3d at 109 (citing <u>United States v. Otero</u>, 502 F.3d 331, 334 n.1 (3d Cir. 2007)). Based upon this principle, the court declined to address whether police officers violated protestors' constitutional rights under the First and Fourth Amendments because the determination involved a case of first impression under Pennsylvania state law and would force the court to make a constitutional pronouncement based upon a prediction of how Pennsylvania courts would decide the issue. <u>Egolf</u>, 526 F.3d at 109. The issue presented in <u>Egolf</u> was whether the protestors' acts of wearing nude colored thongs and building a human pyramid at a parade honoring President

---

whether the defendant was entitled to qualified immunity. The Court grouped those decisions into the following categories:

- The constitutional question is so fact-bound that the decision provides little guidance for future cases.
- It appears that the constitutional question will soon be decided by a higher court or is pending before the court en banc.
- A constitutional decision rests on an uncertain interpretation of state law.
- Qualified immunity is asserted at the pleading stage and the precise factual basis for the plaintiff's claims may be hard to identify.

<u>Pearson</u>, 555 U.S. at 237-39.

George W. Bush gave the police officers probable cause to arrest the protestors under Pennsylvania's lewdness statute, 18 PA. CONS. STAT. § 5901, which required nudity or a sexually explicit act to be actionable. Id. at 109-10 n.10. The court declined to interpret Pennsylvania law and consider whether the protestors' use of nude thongs amounted to nudity as required by the statute. Id. That inquiry, however, was essential to the determination whether the officers had probable cause to arrest the protestors and thus, whether the officers violated the protesters' constitutional rights. In addressing the second prong of the Saucier analysis, the court of appeals found the law was not clearly established at the time and "even if the officers' decision to arrest the protesters was mistaken, it was a reasonable mistake in the context in which it occurred." Egolf, 526 F.3d at 112. The court of appeals held: "[a]s a result, we cannot characterize the officers' actions, for purposes of qualified immunity, as either incompetent or as willful violations of the law," and found the officers were qualifiedly immune for their actions. Id.

Under the second prong of the Saucier analysis, state officials performing discretionary duties are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In order for a federally protected right to be "clearly established" for purposes of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201. State officials can be on notice that their conduct violates clearly established federal law even under novel factual circumstances. Hope v. Pelzer, 536 U.S. 730,

741 (2002). This is because "general statements of law are not inherently incapable of giving fair and clear warning." United States v. Lanier, 520 U.S. 259, 271 (1997).

Here, the issue is whether it would have been clear to reasonable officers in the positions of DiGiovanni, Ditka, Kelly, and Whittaker that their conduct in causing the July 1, 2009 arrest, the July 2, 2009 arrest, or the subsequent detainer to issue was unlawful under the particular circumstances that they confronted. Id. at 202. The standard is objective, viewing the relevant circumstances from the perspective of an objectively reasonable official. Showers v. Spangler, 182 F.3d 165, 171-72 (3d Cir. 1999). "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley, 475 U.S. at 341. To assess whether DiGiovanni, Ditka, Kelly, or Whittaker are entitled to qualified immunity in this case, the court must consider whether their actions were reasonable in light of the clearly established Fourth Amendment principles discussed *supra*.

The court will first consider whether each defendant is entitled to absolute immunity for the actions alleged against them in the second amended or proposed third amended complaint. If they are not entitled to absolute immunity, the court will then determine whether they are entitled to qualified immunity for those same actions. If they are not entitled to qualified immunity, the court will determine whether Spiker alleged a plausible claim against them under § 1983 for violating his Fourth Amendment rights.

### a) DiGiovanni

Spiker alleges in counts I and II of the second amended and proposed third amended complaints that the following actions taken by DiGiovanni constituted a violation of his Fourth Amendment rights: (1) instructing Kelly to determine whether Spiker was registered with the Pennsylvania State Police as a sexual offender; (2) directing Kelly to obtain a warrant for

Spiker's arrest; (3) instituting criminal proceedings against Spiker; and (4) continuing those proceedings against him. With respect to instituting criminal proceedings against Spiker and continuing those proceedings, as discussed above, DiGiovanni is absolutely immune for these actions.

DiGiovanni argues that she is also entitled to absolute immunity for directing Kelly to obtain an arrest warrant for Spiker's arrest. Whether DiGiovanni is correct depends on whether the act is "intimately associated with the judicial phase of the criminal process." Imbler, 424 U.S. at 430. DiGiovanni argues she is absolutely immune for directing Kelly to obtain an arrest warrant because that action is within her core functions as a prosecutor and cites Hudak v. Foulk, No. 06-110, 2007 WL 4287790, at *11 (W.D. Pa. Dec. 5, 2007), and Orobono v. Koch, 30 F. Supp. 2d 843, 844 (E.D. Pa. 1998),[7] in support of this proposition. A review of the relevant case law, however, indicates DiGiovanni is not entitled to absolute immunity for directing Kelly to obtain an arrest warrant for Spiker's arrest. See e.g. Walker v. Clearfield Cnty. Dist. Attorney, 413 F. App'x 481, 483 (3d Cir. 2011) (holding "to the extent that [the plaintiff's] complaint concerns [the prosecutor's] pre-indictment investigation of the allegations against [the plaintiff], [the prosecutor] is entitled only to qualified immunity. By contrast, [the prosecutor] is entitled to absolute immunity…based on the decision to prosecute.").

---

[7] This citation, Orobono v. Koch, 30 F.Supp.2d 840 (E.D. Pa. 1998), refers to two decisions filed on two separate dates. The court's first opinion was dated September 22, 1998. In that decision, the court sets forth the factual allegations of the complaint, but concluded it was not presented with sufficient information to determine whether the prosecutor acted beyond the scope of his authority in demanding the plaintiff be arrested. Orobono, 30 F.Supp.2d at 843. The court requested supplemental briefing on that issue. Id. In the second opinion, dated December 9, 1998, after considering the parties' original and supplemental papers, the court held the prosecutor was entitled to absolute immunity because the plaintiff did not present a factual or legal basis for the court to find the prosecutor acted beyond his authority in demanding the plaintiff be arrested. Id. at 843-44.

Courts have held that the determination whether the giving of advice or direction to the police is a core prosecutorial function depends upon whether the advice or direction was given before or after the filing of charges. See e.g. Burns v. Reed, 500 U.S. 478, 496 (1991); Hudak, 2007 WL 4287760, at *11; Payson v. Ryan, No. 90-1873, 1992 WL 111341, at *7 (E.D. Pa. May 14, 1992) ("Securing the presence of the accused before the court [after charges are filed] in a criminal proceeding is a function intimately associated with the judicial process."). In Burns, the Supreme Court held absolute immunity does not extend to the prosecutorial function of giving advice to the police prior to an arrest or indictment. Burns, 500 U.S. at 496. In that case, the prosecutor gave police officers advice with respect to whether they had probable cause to arrest the plaintiff prior to charges being filed against her. Id. at 481-82. The court held the prosecutor was not entitled to absolute immunity for giving advice to the police because it would be "incongruous to allow prosecutors to be absolutely immune from liability for giving advice to the police, but to allow police officers only qualified immunity for following the advice."[8] Id. at 495. The court found such a holding "would mean that the police, who do not ordinarily hold law degrees, would be required to know the clearly established law, but prosecutors would not." Id.

In Hudak, however, the court held the prosecutor was entitled to absolute immunity because "[l]egal process had already commenced by the time Plaintiff was arrested and, in effect, [the prosecutor] merely acted in his prosecutorial function to secure Plaintiff's appearance at the judicial proceedings." Hudak, 2007 WL 4287760, at *11. In that case, the court distinguished the case before it from Burns, because unlike the prosecutor in Burns, the district attorney in Hudak simultaneously filed charges and obtained warrants for the plaintiff's arrest and did so *before* he

---

[8] In Malley v. Briggs, 475 U.S. 335 (1986), the Supreme Court held that a police officer was not entitled to absolute immunity for seeking an arrest warrant because that act "is further removed from the judicial phase of criminal proceedings than the act of a prosecutor in seeking an indictment." Malley, 475 U.S. 344-45.

directed the police officers to act. Id. Orobono is also distinguishable from Burns because in Orobono, the charges were filed against the plaintiff prior to the prosecutor demanding the police arrest the plaintiff. Orobono, 30 F.Supp.2d at 842. In Orobono, the court held: "Arresting a suspect is a necessary step in the initiation of a criminal prosecution. As a result, it can hardly be separated from the core functions of a prosecutor." Orobono, 30 F.Supp.2d at 842. In Orobono, the plaintiff was accused of assaulting his ex-wife. Id. at 841. The police were called to the scene, but they declined to arrest the plaintiff believing they did not have probable cause to do so. Id. The officers later changed their minds and arrested the plaintiff after his ex-wife's mother signed a private complaint against him. Id. The plaintiff alleged the police changed their minds because the district attorney "demanded" that he be arrested. Id. Like in Hudak, however, charges were filed against the plaintiff in Orobono prior to his arrest, and so the court found the prosecutor was entitled to absolute immunity. Id.

The court considers Hudak and Orobono to be distinguishable from the present case for two reasons. First, according to Spiker, DiGiovanni did not apply for the arrest warrant herself like the prosecutor in Hudak did; she directed Kelly, the police officer, to do it. As the court will discuss infra, Kelly is entitled to qualified immunity for his actions in obtaining the arrest warrant. If the court holds DiGiovanni is entitled to absolute immunity, she would be held to a lesser standard under absolute immunity than Kelly would be under qualified immunity. These are the incongruous results the Court sought to avoid in Burns. See Burns, 500 U.S. at 496. Second, it is not clear from the face of the second amended or proposed third amended complaint when Kelly applied for the arrest warrant and when DiGiovanni filed the charges against Spiker. If DiGiovanni filed the charges on or before June 25, 2009, which is the date Kelly applied for and received a warrant for plaintiff's arrest, this case would be more like Hudak and Orobono

and the court would be inclined to find absolute immunity exists for DiGiovanni. The court, however, does not know when the charges were filed against Spiker and is therefore unable to determine whether DiGiovanni, and Ditka as her alleged supervisor, are entitled to absolute immunity based upon the face of the second or proposed third amended complaint. With respect to whether DiGiovanni, Ditka, Kelly, and Whittaker are entitled to *qualified immunity* for the actions that form the basis of Spiker's claims, a more detailed analysis is required.

With respect to DiGiovanni's instructions to Kelly to determine whether Spiker was registered, the court finds this action is investigative and not prosecutorial in nature as discussed above. To the extent that Spiker set forth a plausible claim against DiGiovanni for that action, DiGiovanni would not be absolutely immune from suit. See Odd v. Malone, 538 F.3d 202, 207 (3d Cir. 2008) (finding absolute immunity does not attach to "investigatory actions unrelated to initiating and conducting judicial proceedings"). It is axiomatic, however, that as an assistant district attorney, DiGiovanni did not need probable cause to instruct Kelly to call the Pennsylvania State Police. If this were the case, many investigations might not be valid. To the extent that Spiker's Fourth Amendment claims against DiGiovanni rest upon her instruction to Kelly to investigate Spiker, those claims fail because DiGiovanni did not violate Spiker's Fourth Amendment rights by instructing Kelly to call the Pennsylvania State Police.

With respect to DiGiovanni directing Kelly to obtain a warrant for Spiker's arrest, although she is not entitled to absolute immunity for this action, it would not have been clear to a reasonable officer in the position of DiGiovanni that her conduct violated a clearly established Fourth Amendment right. Spiker alleges that as an attorney "charged by the county to prosecute offenders, including those accused of failing to register as sexual offenders, DiGiovanni should have known that Pennsylvania law requires the county probation office to submit initial

registration information to the State Police, and not the offender." (ECF No. 108.) Just because DiGiovanni may be aware of the probation office's duty, however, does not mean that a reasonable officer in her position would interpret the probation office's duty in the same way that Spiker does, i.e., the probation office's duty relieved Spiker of his duty to register directly with the state police. As stated above, the interplay between a sexual offender's duty and the probation office's duty under section 9795.2 is not clearly established. Spiker's conclusion that DiGiovanni *should have known* the probation office's duty was paramount to his duty is not sufficient to satisfy the pleading standards set forth in <u>Twombly</u> and <u>Iqbal</u> and, therefore, the court does not have to accept that conclusion as true.

Spiker alleges that he had a duty to register, the state police informed Kelly that Spiker was not registered, Kelly told this information to DiGiovanni, and DiGiovanni directed him to obtain an arrest warrant. Based upon these factual allegations, it would not have been clear to a reasonable officer in the position of DiGiovanni that it was unlawful to obtain a warrant for Spiker's arrest for failing to register. According to the second amended and proposed third amended complaints, DiGiovanni did not instruct Kelly to arrest Spiker without a warrant. She directed him to seek the approval of a neutral magistrate before conducting the arrest. Under these facts and in light of the parties' reasonable, yet differing interpretations of sections 4915 and 9795.2, and the lack of authority on the issue, the court finds the factual allegations set forth in the second amended and proposed third amended complaints do not establish that a reasonable officer in the position of DiGiovanni would have been "plainly incompetent" or would have "knowingly violate[d] the law" by instructing Kelly to obtain a warrant for Spiker's arrest, <u>Montanez</u>, 603 F.3d at 252. DiGiovanni is, therefore, entitled to qualified immunity with respect to those actions.

At best, assuming Spiker's interpretation of section 9795.2 is correct, a reasonable officer in the position of DiGiovanni may have been mistaken about what section 9795.2 required. State officials who make reasonable mistakes, however, are qualifiedly immune from suit. <u>Montanez v. Thompson</u>, 603 F.3d 243, 252 (3d Cir. 2010) (holding "qualified immunity analysis 'gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'") (quoting <u>Egolf</u>, 526 F.3d at 110-11). The amendments in the proposed third amended complaint do not plausibly show that it would have been clear to a reasonable officer in the position of DiGiovanni that her conduct violated clearly established law. Because DiGiovanni is entitled to qualified immunity for the July 1, 2009 arrest (count I), she cannot be held liable for causing the July 2, 2009 arrest or the detainer issued against Spiker (count II). Counts I and II of the second amended complaint will be dismissed against DiGiovanni, and Spiker's motion for leave to file a third amended complaint will be denied as it pertains to counts I and II against her.

**b) Ditka**

In count I of the second and proposed third amended complaints, Spiker avers Ditka, as a deputy district attorney, took the following actions: (1) she continued to detain and prosecute Spiker; and (2) she "knew of and encouraged DiGiovanni to take the steps causing the July 1, 2009 arrest and incarceration of Spiker." (ECF Nos. 108 ¶¶ 36, 58, 156-1 ¶ 34, 46.) As discussed, the court finds Ditka is entitled to absolute immunity for allegedly continuing to detain and prosecute Spiker because these actions are within the core functions of her role as a prosecutor. <u>Imbler</u>, 424 U.S. at 430. Ditka is entitled to qualified immunity for encouraging DiGiovanni to take the actions leading up to Spiker's arrest for the same reasons the court determined that DiGiovanni is qualifiedly immune for those actions and Spiker's failure to allege

that Ditka had superior knowledge of the facts or circumstances surrounding Spiker's arrest. On the face of the second amended and proposed third amended complaints and in light of clearly established law, it would not have been clear to a reasonable officer in the position of Ditka that probable cause was lacking to arrest Spiker for failing to register. The amendments in the proposed third amended complaint, furthermore, do not plausibly show that it would have been clear to a reasonable officer in the position of Ditka that her conduct violated clearly established law. Count I will be dismissed against Ditka, and Spiker's motion for leave to file a third amended complaint will be denied as it pertains to that count against her.

### c)  Kelly

Kelly argues he is entitled to qualified immunity with respect to the claims of false arrest, false imprisonment, and malicious prosecution asserted against him in counts I, II, and III of the second amended and proposed third amended complaints. Kelly is entitled to qualified immunity based upon the faces of the second amended and proposed third amended complaints because, under an objective standard, it would not have been clear to a reasonable officer in the position of Kelly that investigating Spiker and obtaining a warrant for his arrest, which Spiker alleges initiated criminal proceedings against him, violated clearly established law. Spiker asserts that DiGiovanni, a district attorney, instructed Kelly to determine whether Spiker was registered as a sexual offender. Spiker alleges Kelly made a phone call to the Pennsylvania State Police and learned that Spiker was not registered. When Kelly informed DiGiovanni that Spiker was not registered, she instructed Kelly to secure a warrant for his arrest. Spiker alleges that as a Megan's Law compliance officer, Kelly was or should have been aware of the probation office's duty and policy to forward sexual offender probationer's registration information to the state police. Just because Kelly may be aware of the probation office's duty, however, does not mean that a

reasonable officer in the position of Kelly would interpret the probation office's duty in the same way that Spiker does, i.e., the probation office's duty relieved Spiker of his duty to register directly with the state police. Spiker alleges that he had a duty to register, the state police informed Kelly that Spiker was not registered, and a district attorney directed him to obtain an arrest warrant. Based upon these factual allegations, it would not have been clear to a reasonable officer in the position of Kelly that his conduct in obtaining a warrant for Spiker's arrest for failing to register as sexual offender with the state police was unlawful. Under these facts and in light of the parties' reasonable, yet differing interpretations of section 9795.2, the factual allegations set forth in the second amended complaint do not establish that a reasonable officer in the position of Kelly would have been "plainly incompetent" or would have "knowingly violate[d] the law." Montanez, 603 F.3d at 252. Kelly is, therefore, entitled to qualified immunity with respect to Spiker's § 1983 claims in counts I, II, and III of the second amended complaint for false arrest, false imprisonment, and malicious prosecution.

At best, assuming Spiker's interpretation of section 9795.2 is correct, in viewing the issue under an objective standard, a reasonable officer in the position of Kelly, like DiGiovanni, may have been mistaken about what section 9795.2 required. As recognized above, state officials who make reasonable mistakes are qualifiedly immune from suit. The amendments in the proposed third amended complaint do not plausibly show that a reasonable officer in the position of Kelly would have known his actions violated clearly established law. Because the only basis for Kelly's liability in the second amended or proposed third amended complaint with respect to causing the July 2, 2009 arrest (count II), causing the detainer to issue (count II), or initiating criminal proceedings against Spiker (count III) turns on the alleged lack of probable cause in Kelly's actions in causing the July 1, 2009 arrest (count I), Spiker's § 1983 claims against Kelly

in counts II and III for false arrest, false imprisonment, and malicious prosecution must be dismissed because Kelly is qualifiedly immune from suit for his actions in causing the July 1, 2009 arrest. Counts I through III of the second amended complaint will be dismissed against Kelly, and Spiker's motion for leave to file a third amended complaint will be denied as it pertains to counts I through III against him.

### d)   Whittaker

In counts II and III of the second amended and proposed third amended complaints, Spiker avers that Whittaker knew or should have known that he reported to the adult probation office and provided all the information necessary to comply with his sentence, including the information necessary to accomplish his registration under Pennsylvania law. Spiker avers that despite this knowledge, Whittaker took the following actions to cause a deprivation of his Fourth Amendment rights: (1) sought a bench warrant for Spiker's second arrest by informing the presiding judge that Spiker had deliberately violated the terms of his sentence and probation; (2) sought a detainer ensuring that Spiker would remain in custody pending trial; and (3) continued to detain and prosecute Spiker.

Whittaker argues she is entitled to absolute immunity for all actions alleged against her by Spiker. (ECF No. 113 at 7 (citing Kelly v. Montgomery, No. 08-1660, 2008 WL 3408123, at *6 (E.D. Pa. Aug. 8, 2008.)) "[P]robation and parole officers are entitled to absolute immunity when they are engaged in adjudicatory duties." Wilson v. Rackmill, 878 F.2d 772, 775 (3d Cir.1989). "In their executive or administrative capacity, probation and parole officers are entitled only to a qualified, good faith immunity." Id. It follows that Whittaker, like the DA defendants in this case, is entitled to absolute immunity for her role, if any, in prosecuting and continuing to detain Spiker because those actions are adjudicatory in nature. Imbler, 424 U.S. at

430. The malicious prosecution claim against Whittaker will therefore be dismissed because as stated above, a probation officer is entitled to absolute immunity for adjudicatory actions, and initiating a criminal proceeding, which is an element of a malicious prosecution claim, is adjudicatory in nature. Spiker cannot therefore set forth a plausible claim for malicious prosecution against Whittaker for these actions. The malicious prosecution claim asserted against Whittaker in count III in the second amended complaint will be dismissed and Spiker's motion to amend this claim in the proposed third amended complaint will be denied.

Based upon the facts alleged in the second amended and proposed third amended complaints, however, Whittaker is not entitled to absolute immunity for seeking the bench warrant or the detainer because those actions are executive in nature. They were taken to enforce the policies of the probation office. See Wilson, 878 F.2d at 775 (typing up an arrest warrant application and signing the warrant is an executive act); Harper v. Jeffries, 808 F.2d 281, 284 (3d Cir. 1986) (holding probation officer was acting in his executive capacity "as the person who charged the appellant with wrongdoing and presented "evidence" to that effect").

In McBride v. Cahoone, 820 F. Supp. 2d 623, 637-38 (E.D. Pa. 2011), the court found a probation officer was not entitled to absolute immunity for seeking a bench warrant based upon the probationer's violation of the terms of probation. Whittaker cites Kelly, a decision that predates McBride, however, in support of her argument that she is entitled to absolute immunity in this case. In Kelly, the court held the probation officer was entitled to absolute immunity for the following actions:

> Plaintiff alleges that Defendant Drobrowolski recorded Plaintiff's sentence as consecutive at his sentencing on April 25, 2002 and later requested a bench warrant to arrest Plaintiff for a violation of probation. (Compl.¶¶ 12, 25.) Following Plaintiff's arrest, Plaintiff alleges that Defendant Drobrowolski requested a hearing from the sentencing court due to Plaintiff's probation violation and represented to the court that Plaintiff be sentenced to consecutive terms of

> probation. ( *Id.* at ¶ 26, 27.) Plaintiff further alleges that Defendants Murphy and Defendant Hamel approved Defendant Drobrowolski's recording of Plaintiff's sentence as consecutive, the subsequent request for a probation violation hearing and representation that Plaintiff had had a consecutive sentence. ( *Id.* at ¶¶ 17, 22, 28.) Additionally, Plaintiff alleges that Defendant Ficzko requested a bench warrant for Plaintiff's arrest in March 2005 and represented to the court that Plaintiff was subject to probation, when he allegedly was not. ( *Id.* at ¶ 35.)

Kelly, 2008 WL 3408123, at *6. The court found those actions were akin to preparing a presentence report "that assist[s] a court in determining if a criminal defendant violated a court order and in determining an appropriate sentence." Id. As noted by the court in Kelly, the Third Circuit Court of Appeals has held that probation officers are entitled to absolute immunity for preparing a presentence report to assist the court in determining the probationer's sentence. See Stankowski v. Farley, 251 F. App'x 743, 746 (3d Cir. 2007) ("Preparing the presentence report thus was a quasi-judicial function for which [defendant] is absolutely immune from suit."). Notably, the court in Kelly based its finding of absolute immunity on the probation officer's actions that assisted the court in determining the criminal defendant's sentence and did not focus on the probation officer seeking a bench warrant for the criminal defendant's arrest. The court explained:

> A report of the Probation Department's recordings of sentences, which could be checked against the public record, and its recommendations to the court are similar to the function of preparing and submitting a pre-sentence report for court review.
>
> …
>
> It was the court's duty and responsibility to impose a legal sentence. If there was probation officer error in any report or recommendation adopted by the sentencing court, such error is imputed solely to the court. Accordingly, the Probation Officer Defendants' activities were adjudicatory in nature and are afforded absolute immunity.

Kelly, 2008 WL 3408123, at *7. Here, Whittaker's actions alleged by Spiker, i.e., seeking a bench warrant for his arrest and causing a detainer to issue, are not akin to preparing a

presentence report. The court determines that based upon the facts alleged in the second amended and proposed third amended complaints, Whittaker sought a bench warrant because Spiker allegedly violated the terms of his probation by failing to register with the state police. See (ECF No. 108 ¶ 30.) Based upon the facts alleged in the second amended and proposed third amended complaints, Whittaker caused the detainer to issue as a response to Spiker's arrest and incarceration while on probation. See (ECF No. 108 ¶ 32 ("Several days following Plaintiff's incarceration in Allegheny County Jail, Defendant Whittaker issued a detainer.") Whittaker's actions in this regard were a part of her executive duties as a probation officer to enforce the policies of the probation office, and were not an exercise of judicial discretion. See McBride, 820 F. Supp. 2d at 638 (finding probation officer was not entitled to absolute immunity for seeking a bench warrant because he was merely following probation officer procedure in doing so.)  The court concludes, therefore, that based upon the facts alleged in the second and proposed third amended complaints, Whittaker is not entitled to absolute immunity for seeking a bench warrant or causing a detainer to issue. Whittaker may be entitled to qualified immunity for these actions, however, if it would not have been clear to a reasonable officer in her position that those actions violated clearly established law.

The court finds that in light of Whittaker's alleged role as a supervising probation office, she is not entitled to qualified immunity based upon the facts alleged in the second or proposed third amended complaint. Although the court finds that DiGiovanni, Ditka, and Kelly were entitled to qualified immunity in light of the ambiguity that exists in section 9795.2, the same cannot be said for Whittaker. A reasonable officer in the position of a supervising probation officer arguably should have known that Spiker reported to the probation office and gave Dicicco his registration information. In the proposed third amended complaint, there were additional facts

alleged about the probation office's internal policies with respect to sexual offender registration. The court will consider whether Spiker set forth a plausible claim that Whittaker acted without probable cause in seeking the bench warrant and causing the detainer to issue against Spiker based upon the facts alleged in the proposed third amended complaint.

Under section 4915, a sexual offender violates the law if he knowingly fails to register. In light of the probation office's duty and policy to forward registration information to the state police and aid sexual offenders in the registration process, arguably a reasonable officer in Whittaker's position should have determined whether Spiker reported to a probation office before seeking the bench warrant and causing the detainer to issue. Spiker does not allege that the probation office had records indicating who reported to their office, but it may be inferred that Whittaker, as a supervisor, could have consulted Dicicco to determine whether Spiker did not "knowingly" fail to register with the state police before taking court action. This does not implicate whether the probation office's duty alleviated Spiker's duty to register. Under the facts alleged by Spiker, however, Whittaker may not have had a reasonable belief that Spiker knowingly failed to register if she was able – but declined – to investigate whether he reported to the probation office by speaking with employees she was supervising.

To state a claim for false arrest when the defendant acted pursuant to a warrant, the plaintiff must make factual allegations sufficient to set forth a plausible claim:

> (1) that the police officer "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant;" and (2) that "such statements or omissions are material, or necessary, to the finding of probable cause."

Wilson, 212 F.3d at 786-87 (citing Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir 1997)). The court concludes that while the second amended complaint may lack sufficient factual allegations to state a claim, the proposed third amended complaint contains factual allegations

sufficient to set forth a plausible claim that Whittaker recklessly omitted the following material information from her presentation to the judge when she sought the bench warrant for Spiker's second arrest: (1) that the probation office had a duty and policy to forward the registration information of sexual offender probationers to the state police; (2) Spiker reported to the probation office; (3) Spiker gave Dicicco his registration information; and (4) Dicicco failed to forward that information to the state police. If Whittaker had provided the judge this information, probable cause arguably would be lacking for the issuance of the warrant for Spiker's arrest. Because Spiker set forth a plausible claim of false arrest under the Fourth Amendment against Whittaker in the proposed third amended complaint, the court will grant Spiker's motion for leave to file a third amended complaint and will deny Whittaker's motion to dismiss he second amended complaint as moot as it pertains to that claim .

With respect to Spiker's § 1983 claim for false imprisonment against Whittaker, as stated supra, "'where the officer lacks probable cause to make an arrest, there can be a Fourth Amendment claim for false imprisonment based on the detention pursuant to the arrest.'" Brown, 2011 WL 2110827, at *5 (quoting Groman, 47 F.3d at 636). Here, Spiker set forth sufficient factual allegations for the court to conclude the proposed third amended complaint sets forth a plausible inference that Whittaker caused Spiker to be arrested without probable cause and that Spiker was detained pursuant to that arrest. Because the information in the proposed third amended complaint with respect to the probation office's policy to forward registration information to the state police is material to the determination of probable cause with respect to Whittaker obtaining the bench warrant, the allegations in the proposed third amended complaint are sufficient to set forth a plausible § 1983 claim for false imprisonment. The court will grant Spiker's motion for leave to file the third amended complaint as it pertains to Spiker's § 1983

claim of false imprisonment against Whittaker set forth in count II and will deny Whittaker's

motion to dismiss the second amended complaint as moot as it pertains to that claim.

### B. FOURTEENTH AMENDMENT EQUAL PROTECTION CLAIMS (COUNT IV)

In count IV of the second amended complaint, Spiker asserts § 1983 claims against

Whittaker and Kelly for violating his equal protection rights under a "class of one" theory.

> An equal protection claim may be brought by a "class of one," an individual
> claiming "that [ ]he has been intentionally treated differently from others similarly
> situated and that there is no rational basis for the difference in treatment." Vill. of
> Willowbrook v. Olech, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d. 1060
> (2000) (per curiam). To state a claim under the "class of one" theory, a plaintiff
> must show that "(1) the defendant treated him differently from others similarly
> situated, (2) the defendant did so intentionally, and (3) there was no rational basis
> for the difference in treatment." Phillips, 515 F.3d 243 (quoting Hill v. Borough
> of Kutztown, 455 F.3d 225, 239 (3d Cir. 2006)).

Mann v. Brenner, 375 F. App'x 232, 238 (3d Cir. 2010). Spiker alleges the following facts with

respect to his equal protection claims against Kelly and Whittaker:

> The conduct of Kelly and Whittaker also resulted in a violation of Spiker's equal
> protection rights. It is clear, based upon the cases that are detailed on Exhibit 3,
> that individuals who delayed in registering with the State Police were not arrested,
> prosecuted and did not have detainers for probation violations issued against them
> when they finally registered. In fact, they were permitted to register, when they
> did, without jeopardy of arrest, prosecution or loss of liberty. In fact, Spiker
> registered on his own on July 1, 2009, before the arrest sparked by Whittaker's
> action.

(ECF No. 108 ¶ 95.)   These allegations are insufficient to state a plausible claim under the

Fourteenth Amendment. Spiker did not allege that Kelly was involved in any of the cases listed

in Exhibit 3 or that Kelly treated him differently than any other similarly situated individuals

known to Kelly. The court will therefore dismiss count IV of the second amended complaint

against Kelly, and the motion for leave to amend will be denied because the factual allegations in

the proposed third amended complaint are insufficient to support a plausible Fourteenth

Amendment claim against Kelly.

Spiker failed to allege a plausible equal protection claim against Whittaker because he failed to set forth factual allegations to show that Whittaker intentionally treated him differently than other similarly situated persons. There are no allegations that Whittaker knew about or was involved in the cases outlined in Exhibit 3. If Whittaker did not know or was not involved in those cases, she could not have intentionally treated Spiker differently than those people. For these reasons, Spiker failed to set forth a plausible equal protection claim against Whittaker. The court will therefore dismiss count IV of the second amended complaint against Whittaker. The court denies Spiker's motion for leave to file the third amended complaint because it does not contain allege factual allegations sufficient to support a plausible claim that Whittaker intentionally treated Spiker differently than similarly situated persons known to Whittaker.

On April 26, 2011, the court dismissed the equal protection claims against DiGiovanni and Ditka because they were entitled to absolute immunity for initiating the criminal proceedings against Spiker. (H.T. 4/26/12 at 9-10 (ECF No. 177 at 9-10.)) Spiker did not allege equal protection claims against them in the second amended complaint. DiGiovanni and Ditka, therefore, did not address the equal protection claims in their motion to dismiss the second amended complaint. Spiker, however, alleges DiGiovanni and Ditka violated his equal protection rights in count IV of the proposed third amended complaint. The court will deny Spiker's motion for leave to amend the third amended complaint to include those claims against the DA defendants based upon futility because Spiker failed to set forth in the proposed amendment a plausible claim for relief under the equal protection clause against the DA defendants. In the proposed third amended complaint, Spiker did not set forth factual allegations sufficient to support a plausible claim that Spiker was treated differently than other similarly situated individuals and that DiGiovanni and Ditka lacked a rational basis for differently treating Spiker.

In the proposed third amended complaint, Spiker avers: "[DiGiovanni] had been fed false information about Spiker by a mutual acquaintance with a checked lifestyle,[9] which prompted her to irrationally and arbitrarily view Spiker differently from other defendants she had prosecuted." (ECF No. 156-1 ¶ 75.) DiGiovanni's receipt of information about Spiker from a mutual acquaintance defeats Spiker's claim that he was similarly situated with the defendants in the cases listed in Exhibit 3. "Persons are similarly situated under the Equal Protection Clause when they are alike "'in all relevant aspects.'" Startzell v. City of Phila., 533 F.3d 183, 203 (3d Cir. 2008) (quoting Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)). In the proposed third amended complaint, Spiker alleges that DiGiovanni instructed Kelly to investigate whether Spiker was registered as a sexual offender because she received information about Spiker from a mutual acquaintance. There are no allegations in the proposed third amended complaint that DiGiovanni learned information about any of the defendants listed in Exhibit 3 from mutual acquaintances. As alleged, Spiker and the defendants listed in Exhibit 3 are not similar in all relevant aspects. Spiker, therefore, failed to state an equal protection claim against the DA defendants, and the court will deny Spiker's motion for leave to file a third amended complaint as it pertains to the equal protection claims against DiGiovanni and Ditka.

### C.  STATE LAW CLAIMS AGAINST KELLY AND WHITTAKER (COUNTS V AND VII)[10]

---

[9]  Spiker's allegation that the mutual acquaintance had a checkered lifestyle is a conclusion, which is not supported by factual allegations in the proposed third amended complaint. The court, therefore, does not accept this allegation as true.

[10]     Pursuant to 28 U.S.C. § 1367, the court will exercise supplemental jurisdiction over the state law claims brought against Kelly and Whittaker. The court has federal question jurisdiction over this case because Spiker asserts a claim against Whittaker under § 1983 for the deprivation of his constitutional rights. "When a court exercises federal question jurisdiction it may in its discretion elect to exercise supplemental jurisdiction over any pendent state law claims." Craig v. Salamone, No. 98-3685, 1999 WL 615629, at *2 (E.D. Pa. Aug. 12, 1999) (citing 28 U.S.C. § 1367). This includes "claims that involve the joinder or intervention of additional parties," 28

### i.     Immunity under Pennsylvania law

Whittaker and Kelly argue Spiker's state law claims for false arrest, false imprisonment, and malicious prosecution in count V, and for IIED in count VII are barred by the immunity granted to employees of local agencies by the Pennsylvania Subdivision Tort Claims Act, 42 PA. CONS. STAT. § 8541, *et seq* ("PSTCA"). (ECF No. 113 at 7.)

### a)  Whittaker

Whittaker is not entitled to immunity under the PSTCA because she is not an employee of a local agency. As a probation officer, Whittaker is an employee of the Commonwealth of Pennsylvania.[11] Whether she is entitled to immunity, must be addressed under Pennsylvania's sovereign immunity statute, 1 PA. CONS. STAT. § 2310. That section provides:

> Pursuant to section 11 of Article 1 of the Constitution of Pennsylvania, it is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity.

---

U.S.C. § 1367, and is referred to as "pendent party jurisdiction." See West Mifflin v. Lancaster, 45 F.3d 780, 787 (3d Cir. 1995).

> [A] court considering whether to exercise pendent party jurisdiction should focus its inquiry on whether the pendent party's claims "are so related to claims in the action within [the] original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). This standard asks both whether the pendent claims arise from a "common nucleus of operative fact" and whether the claims are such that a plaintiff "would ordinarily be expected to try them in one judicial proceeding." United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

Craig, 1999 WL 615629, at *3 (emphasis added). This means the court may exercise supplemental jurisdiction over the state law claims brought against Kelly although all federal law claims will be dismissed against him because the federal law claims against Whittaker and the state law claims against Kelly arise from a common nucleus of operative facts, i.e., Spiker's July 1, 2009 and July 2, 2009 arrests and subsequent detention.

[11] "The probation department is an arm of the state, and its employees are state actors, making them subject to sovereign immunity." Clark v. Conahan, 737 F.Supp.2d 239, 258 (M.D. Pa. 2010).

> When the General Assembly specifically waives sovereign immunity, a claim against the Commonwealth and its officials and employees shall be brought only in such manner and in such courts and in such cases as directed by the provisions of Title 42 (relating to judiciary and judicial procedure) or 62 (relating to procurement) unless otherwise specifically authorized by statute.

1 PA. CONS. STAT. § 2310.

> There are nine (9) specifically delineated exceptions to this sovereign immunity. They are: (1) vehicle liability; (2) medical/professional liability; (3) care, custody, or control of personal property; (4) Commonwealth real estate, highways, and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody, and control of animals; (7) liquor store sales; (8) National Guard activities; and (9) toxoid and vaccines.

Dec v. Pa. State Police, No. 12-565, 2012 WL 6099078, at *12 (W.D. Pa. Dec. 7, 2012) (citing

42 PA. CONS. STAT. § 8522(b)(l)-(9)). None of these exceptions apply to this case. Whittaker,

therefore, may be entitled to sovereign immunity under section 2310 if the actions alleged

against her by Spiker were taken in the scope of her employment as a probation officer for the

Commonwealth of Pennsylvania. 1 PA. CONS. STAT. § 2310.

> Under Pennsylvania law, an action falls within the scope of employment if it: (1) is the kind that the employee is employed to perform; (2) occurs substantially within the job's authorized time and space limits; **(3) is motivated at least in part by a desire to serve the employer**; and (4) if force was used by the employee against another, the use of force is not unexpectable by the employer.

Mitchell v. Luckenbill, 680 F.Supp.2d 672, 682 (M.D. Pa. 2010) (quoted in Dec, 2012 WL

6099078, at *12) (emphasis added). Unlike the immunity afforded to local government agencies

under the PSTCA and discussed infra, "[w]illful misconduct does not vitiate a Commonwealth

employee's immunity if the employee is acting within the scope of his employment." Mitchell,

680 F.Supp.2d at 682 (quoted in Dec, 2012 WL 6099078, at *12.)[12]

---

[12] With respect to whether Whittaker was acting within the scope of her employment when she sought the bench warrant for Spiker's arrest and caused the detainer to issue, Spiker alleges that although Whittaker acted without probable cause, she "was acting under color of state law." (ECF No. 108 ¶¶ 79, 89.) This allegation, however, is not determinative with respect

With respect to whether Whittaker is entitled to sovereign immunity in this case, the issue is whether Whittaker was acting within the scope of her employment when she sought the bench warrant and caused the detainer to issue against Spiker without probable cause as alleged in the second amended and proposed third amended complaints. There is no dispute raised with respect to the first, second, or fourth factors used to determine whether an employee acted within the scope of his or her employment. Instead, the determination in this case turns on the third factor, i.e., whether Whittaker's actions were motivated at least in part by a desire to serve the employer. At least one court addressing this issue has held that if an officer knowingly does not have probable cause to conduct an arrest, but does so anyway, the officer's actions are not performed within the scope of his or her employment because they no longer serve the interests of the employer. Perkins v. Staskiewicz, No. 08-1651, 2009 WL 693176, at *4 (M.D. Pa. Mar. 13, 2009).

In Perkins, at the motion to dismiss stage of the proceedings, the court considered whether a defendant police officer was entitled to sovereign immunity under section 2310 for allegedly arresting plaintiff although he knew he did not have probable cause to do so. Perkins, 2009 WL 693176, at *4. The issue was directed to whether the police officer was "motivated at least in part by a desire to serve the employer." Mitchell, 680 F.Supp.2d at 682. The court noted that "a mere failure to have probable cause in effectuating an arrest does not prevent the

to whether Whittaker was acting within the scope of her employment. As this court stated in Hickenbottom v. Nassan:

> The concepts of acting "under color of state law" and acting "within the scope of employment" while comparable are not the same. Compare Barna v. City of Perth Amboy, 42 F.3d 809, 816 (3d Cir.1994) (acting under color of law means that the officer depends upon the cloak of the state's authority as a means to commit the alleged acts and that authority enables the officer to do what he did) with RESTATEMENT (SECOND) OF AGENCY § 228.

Hickenbottom v. Nassan, No. 03-223, 2007 WL 7753803, at *43 (W.D. Pa. Mar. 29, 2007).

application of sovereign immunity when the officer's actions otherwise fall within the scope of his employment." Id. (citing Pansy v. Preate, 870 F.Supp. 612 (M.D. Pa. 1994); Shoop v. Dauphin County, 766 F.Supp. 1327 (M.D. Pa. 1991); Pickering v. Sacavage, 642 A.2d 555 (Pa. Commw. Ct. 1994). The court found that the decisions it cited in support of that proposition were distinguishable from the case before it "because in none of those cases was there an allegation that the defendant officer knowingly or purposefully made an arrest without probable cause." Perkins, 2009 WL 693176, at *4. Because the plaintiff set forth factual allegations sufficient for the court to make a plausible finding that defendant knew he did not have probable cause to effectuate an arrest of the defendant, the defendant was not entitled to sovereign immunity at that stage of the proceedings. Id. The court explained:

> Plaintiff alleges that Defendant Staskiewicz arrested Plaintiff knowing that the investigation was flawed and that he lacked probable cause to make the arrest. Staskiewicz' knowledge that he was making an unlawful arrest is important because it takes conduct that would have been within the scope of his employment as a police officer—investigating complaints and making arrests— outside the scope of employment because it no longer serves the interests of the employer.

Id.

Here, as discussed above under federal law, in determining whether an official is entitled to qualified immunity, Spiker set forth factual allegations sufficient for the court to make a plausible finding that under an objective standard, a reasonable officer in the position of Whittaker would know that she did not have probable cause to obtain a bench warrant and detainer against Spiker because Whittaker never determined whether Spiker reported to the probation office to register prior to seeking his arrest. (See ECF No. 108 ¶ 71.) With respect to whether Whittaker is entitled to immunity under state law, the court applies a subjective standard, i.e., whether Whittaker actually knew she did not have probable cause to arrest Spiker.

In the second amended and proposed third amended complaints. Spiker, however, failed to set forth factual allegations sufficient to meet this subjective standard. Spiker alleges that Whittaker "knew or should have known that Spiker's arrest should not have resulted in the issuance of an arrest warrant." (ECF No. 108 ¶ 84.) Spiker does not set forth factual allegations that support the bald conclusion that Whittaker knew it was the probation office's duty to register Spiker and that Spiker did not have an independent duty to ensure he was registered. This case is distinguishable from Perkins because, unlike in that case where the plaintiff set forth factual allegations that the defendant knew he did not have probable cause, Spiker failed to set forth factual allegations sufficient for a reasonable inference to be drawn that Whittaker actually knew there was no probable cause to arrest Spiker for violating his probation. Under those circumstances, and because no argument was raised with respect to the other factors listed above, the faces of the second amended and proposed third amended complaints are sufficient to show that Whittaker was acting within the scope of her employment when she sought a bench warrant and detainer in response to Spiker's alleged violation of his probation. Whittaker is therefore entitled to immunity with respect to the state law claims raised against her. The state law claims in counts V and VII of the second amended complaint will be dismissed against Whittaker, and the motion for leave to file the proposed third amended complaint will be denied because it does not cure the defects discussed above.

**b) Kelly**

With respect to whether Kelly is entitled to immunity under the PTSCA, that act "provides absolute immunity to local agencies except for eight statutorily defined exceptions." Ferrone v. Onorato, 439 F.Supp.2d 442, 453 (W.D.Pa. 2006). "Under 42 Pa.C.S. § 8545 an employee of a local agency is liable for acts within the scope of his official duties only to the

extent that the local agency is liable." Lance v. Giles, 572 A.2d 827, 830 (Pa. Commw. Ct. 1990). As an Allegheny County police officer, Kelly is an employee of a local agency and may be entitled to immunity under the PTSCA.[13]

The PSTCA does not bar claims against local government employees for conduct that rises above negligence. Section 8550 of the PSTCA provides:

> In any action against a local agency or employee thereof for damages on account of an injury caused by the act of the employee in which it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or **willful misconduct**, the provisions of sections 8545 (relating to official liability generally), 8546 (relating to defense of official immunity), 8548 (relating to indemnity) and 8549 (relating to limitation on damages) shall not apply.

42 PA. CONS. STAT. § 8550 (emphasis added). "Willful misconduct, for the purposes of tort law, has been defined by [the Pennsylvania] Supreme Court to mean conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied." Renk v. Pittsburgh, 641 A.2d 289, 293 (Pa. 1994) (citing Evans v. Phila. Transp. Co., 212 A.2d 440, 443 (Pa. 1965)).

In the second amended and proposed third amended complaints, Spiker asserts state law claims against Kelly for false arrest, false imprisonment, malicious prosecution, and IIED. As noted, the PSTCA does not bar suit against a local government employee for willful misconduct, i.e., "conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied." Renk, 641 A.2d at 293 (citing Evans, 212 A.2d at 443). Here, in the second amended and proposed third

---

[13]   "A 'local agency' is defined to include '[a] government unit other than the Commonwealth government.' 42 Pa.C.S. § 8501. Accordingly, Westmoreland County is a local agency immune from damages." Lenhart v. Pa., 2012 WL 6562756, at *6 (W.D. Pa. Nov. 1, 2012); see Dec, 2012 WL 6099078, at *12 ("The County and the County District Attorney's Office, as municipal agencies, are completely immune from liability for state tort claims under Pennsylvania's Political Subdivisions Tort Claims Act ("PSTCA").").

amended complaints, Spiker alleges that Kelly "knew or should have know[n]" that he did not have probable cause to arrest Spiker. (ECF Nos. 108 ¶ 59; 156-1 ¶ 47.) Without additional factual allegations to support an inference that Kelly *knew* it was the probation office's duty to register Spiker, this bald conclusion is not sufficient to support a plausible claim that Kelly desired to cause harm unlawfully to Spiker or that he knew his actions were substantially certain to cause harm unlawfully to him. Kelly, therefore, is entitled to immunity under the PTSCA with respect to the state law claims asserted against him because Spiker failed to allege actions on the part of Kelly that rise above negligence under Pennsylvania law. The state law claims in counts V and VII of the second amended complaint will be dismissed against Kelly and the motion for leave to file the proposed third amended complaint will be denied because it does not cure the defects discussed above.

### VI.    Order

And NOW, this 30th day of January, 2013:

1. DiGiovanni's motion to dismiss (ECF No. 109)  the claims asserted against her in counts I and II of the second amended complaint is GRANTED;

2. Ditka's motion to dismiss (ECF No. 109) the claim asserted against her in count I of the second amended complaint is GRANTED;

3. Kelly's motion to dismiss (ECF No. 111) the claims asserted against him in the second amended complaint in counts I through V and count VII is GRANTED;

4. Whittaker's motion to dismiss (ECF No. 111) the claims against her in counts I through V and count VII of the second amended complaint is GRANTED IN PART with respect to, the malicious prosecution claim in count III, the Fourteenth Amendment claim in count IV, and the state law claims in counts V and VII, and is DENIED as MOOT with respect to all other claims in light of the granting of leave for plaintiff to file the proposed amendments to count II.

5. Spiker's motion for leave to file a third amended complaint (ECF No. 156) is DENIED IN PART and GRANTED IN PART as follows:

a. With respect to the claims asserted against DiGiovanni in counts I, II, and IV, it is DENIED;

b. With respect to the claims asserted against Ditka in counts I and IV, it is DENIED;

c. With respect to the claims asserted against Kelly in counts I through VI, it is DENIED; and

d. With respect to the claims asserted against Whittaker, it is GRANTED with respect to count II, but it is DENIED for all other claims asserted against her.

IT IS SO ORDERED.

/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge